# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. CR409-004 |
| | ) | |
| ANDRE JEROME ROUSE, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant Andre Jerome Rouse, who is charged with possession of a firearm with an obliterated serial number, has moved to suppress all evidence obtained as a result of his seizure, arrest, and later questioning by Savannah police officers. (Docs. 14 & 34.) For the reasons that follow, his motion should be **DENIED**.

## I. FACTS[1]

On the evening of November 7, 2008, Alvin Edwards notified the Savannah-Chatham Metro Police Department that he had been robbed at

---

[1] The following facts are drawn from the suppression hearing testimony of several police officials (Detectives Yujean Foster and Joshua Hunt and Officers Michael Rodgers, Jason Pagliaro, and Tracy Walden) and defendant Andre Rouse. Except as otherwise noted, the facts are uncontested.

gunpoint by two black males outside the Ramsey Run Apartments as he attempted to sell them some marijuana.[2]  He described the weapons and indicated that the robbers had taken his marijuana, cell phone, and gold necklace.  Edwards also informed Det. Yujean Foster that the robbers had come out of an upstairs apartment, which he then identified as Apartment C-7.  Det. Foster was familiar with this apartment, for three months earlier he had investigated two other armed robberies occurring minutes apart at the same apartment complex, had received information that caused him to focus his attention on Apartment C-7, and had determined that the apartment was leased by Henry Rouse (defendant Andre Rouse's older brother).  Subsequent police surveillance confirmed that both Henry Rouse and Andre Rouse frequented Ramsey Run Apartments.

After speaking with Edwards, Det. Foster knocked on the door of Apartment C-7, announced "police" in a loud voice, and asked for "Henry" to come to the door.  Although no one responded to this request, Officer Michael Rodgers (and later Det. Foster and other officers) observed someone peeking through the apartment's window blinds.

---

[2]  Initially, Edwards neglected to mention that he was trying to sell marijuana to the robbers.

Suspecting that several armed men were holed up in the apartment, Det. Foster left to secure a warrant while Officer Rodgers remained outside the apartment building to ensure that no one entered or left Apartment C-7. Because Rodgers was unable to watch both of the stairwells leading up to the second-story apartment, he called upon Officer Jason Pagliaro for assistance. Rodgers changed into his SWAT team[3] uniform, switched from his handgun to his M4 rifle, and remained in his vehicle while monitoring the apartment. Upon his arrival, Officer Pagliaro armed himself with a shotgun while he monitored the back stairwell.

A short time later, defendant Andre Rouse drove up, parked his vehicle, went up the front stairwell, and immediately gained entry to Apartment C-7. Rodgers called Det. Foster to verify his instructions. Foster told him to detain anyone leaving the apartment. Some five minutes later, Andre Rouse exited the apartment carrying a laundry basket filled with clothes. A puppy followed at his feet. As Rouse reached the bottom of the stairwell, Rodgers approached with his pistol drawn in the "low ready" position (i.e., pointed in Rouse's direction but

---

[3] Det. Foster had informed Rodgers that he intended to enlist the services of the SWAT team because of the dangers inherent in a police standoff with men believed to be armed and dangerous.

with the barrel aimed at the ground) and shouted out "police, get down!"
Rouse froze but did not get on the ground as ordered. Rodgers repeated
his command in a loud voice, but again Rouse did not comply. Rodgers,
who was only a few feet away by this point, then aimed his pistol directly
at Rouse and yelled for him to get down. Rouse ignored this command as
well. Not until Officer Pagliaro appeared as backup and "racked" his
shotgun (by chambering a new round) did Rouse finally set the basket
down and drop to his knees. Even then it took further coaxing by the
officers to get Rouse all the way onto the ground. Rodgers kicked the
basket aside as he frisked and handcuffed Rouse. Once Rouse was
secured and escorted to another officer some distance away, Rodgers
retrieved the laundry basket (which seemed strangely heavy), placed the
puppy in it, and put this property in a police cruiser for safekeeping. As
he did so, Rodgers indicated to a nearby officer that the basket had not
been searched or checked for weapons.[4]

When Det. Foster returned with a search warrant for Apartment C-
7, a negotiation team was already in place talking to the apartment's

---

[4]     Later on, apparently through some oversight, an unidentified officer
temporarily placed Rouse in the same police cruiser that contained the laundry
basket and puppy. Thus, there was a time after he was detained that Rouse had
access to the items in the laundry basket (which, as will be seen, contained loaded
firearms).

occupants and trying to defuse the standoff. About this time, Rouse's mother and sister arrived at the scene, advised Cpl. Tracy Walden that her other son (Henry Rouse) had been calling her from inside the apartment, and inquired about the puppy. As soon as Walden learned that Henry and the other suspects had exited the apartment, she removed the puppy from the patrol car and gave it to Rouse's mother. Cpl. Walden was about to hand over the laundry basket as well, but when she removed it from the patrol car she noticed that it was "extremely, extremely" heavy and immediately suspected that there were weapons concealed under the clothes. She set the basket on the ground, advised Mrs. Rouse and her daughter to step back, and reached in the basket, where she felt the butt of a handgun. Upon further inspection of the basket, detectives found seven pistols, six of them loaded, stuffed inside a pillowcase. Andre Rouse was then placed under arrest.

During the execution of the search warrant for the apartment, officers found several cell phones, including Rouse's burgundy Motorola "Razr." An inspection of that phone revealed numerous photographs of firearms, including some of the pistols found inside the laundry basket.

Several of those photographs depicted the pistol with an obliterated serial number that forms the basis of the present indictment.

Later that night, at around 3:00 a.m. on November 8, Det. Foster spoke with Rouse at police headquarters, advised him of his *Miranda* rights, and asked if he would submit to an interview. Rouse agreed and signed a waiver-of-rights form. The ensuing hour-and-fifteen-minute interview was audio and video recorded. Det. Foster testified that Rouse was calm, cooperative, and "seemed normal" throughout the interview. On this occasion, Rouse disclaimed any knowledge of the weapons found in the laundry basket.

On December 12, 2008, Det. Joshua Hunt conducted a second custodial interview of Rouse. After arresting Rouse at his residence (where he had just shared a marijuana "joint" with two companions), Det. Hunt transported him to the police department, placed him in an interview room, and advised him of his *Miranda* rights, which Rouse waived.[5] According to Hunt, Rouse was "relaxed, cooperative, and

---

[5] While Rouse testified that he was never advised of his *Miranda* rights before this second interview (a claim that he also made as to the earlier interview before the government furnished defense counsel with a copy of the signed waiver-of-rights form), the Court credits Det. Hunt's testimony on this point. There is no recording of this interview. Hunt testified that the recording hardware malfunctioned and that Rouse's interview (along with some others conducted during this time) was lost.

friendly," "appeared to be levelheaded," and did not display any of the typical signs of someone profoundly under the influence of an intoxicant. During this interview, Rouse conceded that he knew that the laundry basket contained firearms but denied knowing which weapon was attributable to which person in the apartment.

## II.    ANALYSIS

Rouse seeks to suppress all physical evidence acquired as a result of his seizure outside the apartment building,[6] as well as his later custodial statements to the detectives.    To analyze these claims, the Court must address each phase of the seizure, search, and interrogation process.

### A.    Initial Detention

Rouse argues that at the moment he was first approached by the police, "a full scale arrest occurred" that was unsupported by probable

---

[6]    In addition to the firearms found in the laundry basket, Rouse seeks to suppress his "cell phone . . . [and] any and all information, photographs, or other data accessed from the cell phone."    (Doc. 14 at 3-4.)    As Rouse conceded at the suppression hearing, however, his cell phone was found inside the apartment during the execution of the search warrant, not on his person at the time of his seizure. Although Rouse does not challenge the validity of the state search warrant, he does suggest that the seizure of his cell phone (and the photographs stored on that phone) exceeded the scope of the search warrant.

cause. (Doc. 14 at 4.) He suggests that all subsequently acquired evidence was the fruit of that initial illegality. The government characterizes Rouse's initial seizure as an "investigative detention" justified by the officers' reasonable suspicion that he was aiding the perpetrators of an armed robbery in removing evidence from the apartment where they were hiding. (Doc. 40 at 1; doc. 27 at 3-4.) The Court agrees with the government that under the unique circumstances of this case, the officers were entirely justified in temporarily detaining Rouse for investigative purposes. Further, given the obvious safety concerns at play, the officers acted appropriately in drawing their firearms in order to effectuate that detention, placing Rouse in handcuffs, and delivering him to the custody of other officers while they turned their attention back to the highly volatile situation involving a police standoff with the occupants of Apartment C-7.

When Rouse first arrived at Ramsey Run Apartments, Officers Rodgers and Pagliaro were engaged in monitoring an apartment unit occupied by individuals suspected of a recent armed robbery. These individuals had ignored police requests to come to their door, and the officers were under the reasonable impression that the individuals inside

the apartment were armed and dangerous. The officers were aware that Det. Foster was in the process of seeking a search warrant for the apartment, and they also knew that the Savannah police SWAT team had been alerted to prepare for a possible forced entry into that apartment.

Into this tense situation walks Andre Rouse. He immediately gains entry to the apartment whose occupants had just refused any entry by the police. A few minutes later, he exited the apartment carrying a laundry basket. Perhaps Mr. Rouse had chosen just this moment to do his laundry. But under the unusual and rather dramatic circumstances of a police standoff with suspected armed robbers, the officers tasked with guarding the premises while a search warrant was obtained were not required to infer the most innocent-seeming explanation for Rouse's conduct. Instead, it was perfectly reasonable for the officers to suspect Rouse of being in league with those inside the apartment and, more particularly, with aiding and abetting their removal of incriminating evidence (including firearms) or assisting them in their escape.

Officers engaged in the dangerous business of enforcing the criminal laws are entitled to make common-sense judgments and

inferences about human behavior. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996); *United States v. Cortez*, 449 U.S. 411, 418 (1981); *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004). Such "an officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Wardlow*, 528 U.S. at 124. "[A] reviewing court must give due weight to the officer's experience" when assessing the reasonableness of his conclusions and actions in making an investigatory stop. *United States v. Briggman*, 931 F.2d 705, 709 (11th Cir. 1991). Here, the undisputed facts establish the requisite "reasonable suspicion" to warrant an investigatory stop of defendant Rouse. These officers, even if they lacked probable cause, certainly had far more than an "inchoate and unparticularized hunch" of wrongdoing when they seized Rouse. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). At the suppression hearing, the officers articulated reasonable grounds for their belief that, under the highly charged circumstances of this case, Rouse was up to no good when he sauntered out of the apartment carrying a laundry basket, and they were eminently reasonable in stopping him to investigate their suspicions. *See*

*United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (detective had reasonable suspicion to stop man leaving suspected marijuana grow house when he was carrying a black trash bag capable of concealing marijuana and the residence was under surveillance prior to its warrant-based search); *United States v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989) (finding reasonable suspicion to detain female who was walking away from the scene of an arrest but had earlier been seen with a known drug dealer); *see also United States v. Young*, 909 F.2d 442, 446 (1990) (exigent circumstances permitted officers to search suspect's bulging purse when she attempted to sneak away from her house while officers were executing a search warrant). Since Rouse's actions were highly unusual and quite suspect, his investigatory detention was reasonable even though the officers lacked probable cause to arrest him upon their initial approach.

Nor did the manner of the seizure convert the investigatory stop into a full scale arrest, as Rouse argues. Officers effectuating a *Terry* stop may draw their weapons and use reasonable force when legitimate safety concerns call for such measures. In *Terry* itself, an officer who suspected individuals of casing a store in preparation for a robbery not

only approached to investigate his suspicions but, because of his safety concerns, forcefully spun one of the suspects around and patted him down for weapons. *Terry*, 392 U.S. at 5-7. So, from the moment that the reasonable suspicion standard was first announced, the Supreme Court recognized that an investigatory stop may involve the use of some degree of force by the investigating officer. Subsequent courts have upheld *Terry* stops involving far more coercive measures than were employed in *Terry* itself. *See, e.g., United States v. Blackman*, 66 F.3d 1572, 1574, 1576-77 (11th Cir. 1995) (initial detention was investigatory stop rather than an arrest, even though agents used a loudspeaker to direct individuals suspected of armed robbery to exit an apartment with their hands up, handcuffed them, and then placed them on the ground); *United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (turkey hunter and agents effected a seizure rather than an arrest of suspects found near a marijuana cultivation site even though the suspects were ordered to raise their hands, told that their dog would be shot if not called off, and then were frisked). If such forceful measures are reasonable under the circumstances, they "do not transform an investigatory stop into an arrest." *Blackman*, 66 F.3d at 1576; *United*

*States v. Acosta*, 363 F.3d 1141, 1147 (11th Cir. 2004) ("an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon, handcuffs a suspect, orders a suspect to lie face down on the ground, or secures a suspect in the back of a patrol car.") (citations omitted).

Here, at the time Officer Rodgers approached Rouse with his weapon drawn, he had a legitimate fear that Rouse was not only assisting some desperate individuals holed up in an apartment but might himself be armed and dangerous. These fears were enhanced when Rouse refused to get on the ground despite repeated commands, prompting Rodgers to point his firearm directly at Rouse. Only when another officer appeared and racked his shotgun -- producing "a sound you won't forget," as Officer Pagliaro put it -- did Rouse grudgingly comply. Even then, he only partially complied, taking a knee rather than going all the way to the ground as the officers were loudly ordering him to do. The safety precautions employed by these officers in making the *Terry* stop were an appropriate and measured response to a situation they reasonably perceived to be fraught with danger. Given the circumstances swirling around the officers at this time, they were

perfectly justified in handcuffing Rouse and delivering him to the custody of another officer while they turned their attention back to the apartment where other suspected dangerous individuals were known to be hiding. In short, the risks to law enforcement officers posed by this investigatory detention fully warranted such intrusive measures.

### B.   The Laundry Basket Search

The search of the laundry basket that led to the discovery of the firearms presents a somewhat more troublesome issue -- not because the officers lacked authority to do so immediately upon Rouse's seizure, for they certainly had such authority,[7] but rather because the basket was not inspected until at least an hour after its seizure.

It is well settled, of course, that officers who temporarily seize a suspect for investigative purposes may conduct a frisk of that individual so long as "a reasonably prudent man in the circumstances would be

---

[7] Whether analyzed as a *Terry* stop or an arrest, Rouse's seizure by the officers entitled them to conduct a contemporaneous search of any area from which he might produce a weapon or gain access to destructible evidence. *Chimel v. California*, 395 U.S. 752, 763 (1969) (police may search incident to arrest not only an arrestee's person but also any area within his immediate control from "which he might gain possession of a weapon or destructible evidence"); *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983) (during lawful investigatory stop, police were entitled to conduct protective search of vehicle passenger compartment when they reasonably believed suspect was dangerous and might gain immediate control of weapon).

warranted in the belief that his safety or that of others was in danger."
*Terry*, 392 U.S. at 27; *United States v. Bonds*, 829 F.2d 1072, 1074 (11th
Cir. 1987) (distinguishing between the "stop" and "frisk" elements of the
*Terry* analysis, noting that "a stop serves to investigate crime, while a
frisk serves to prevent injury."). Numerous courts have recognized that
the *Terry* analysis allows not only a frisk of a suspect believed to be
armed and dangerous but also a brief inspection of any items carried by
that individual that might pose a risk to the officer's safety. *See United
States v. Rhind*, 289 F.3d 690, 693-94 (11th Cir. 2002) (police conducting
*Terry* stop of defendant were entitled to search a black bag he was
carrying, as "the officers had a reasonable articulable suspicion, based
upon objective facts, that the bag might contain a weapon or other
contraband."); *United States v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989)
(because detective had reasonable suspicion to stop person suspected of
being involved in narcotics trafficking, he had the right to make a limited
protective search for concealed weapons, to include a search of the
suspect's purse); *see also United States v. Quinn*, 83 F.3d 917, 923 (7th
Cir. 1996) ("thud" sound produced when a suspect placed a rolled-up
jacket on hood of car justified pat-down of jacket); *United States v.*

*Williams*, 962 F.2d 1218, 1223-24 (6th Cir. 1992) (officer entitled to open and search suspect's purse "as a reasonable self-protective measure"); *Owens v. State*, 497 N.E.2d 230 (Ind. 1986) (during a *Terry* stop of an armed robbery suspect who was carrying a bag he claimed contained laundry but which made a metallic sound when put on squad car, proper for officer to feel of bag and, when a long hard object was detected, to open bag and remove a weapon concealed inside). 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.6(e) (4th ed. 2004) (noting that most courts, unlike most commentators, have recognized the right of law enforcement officers to conduct a protective search of items carried by suspect at the time of a *Terry* stop).

The government is correct in asserting that, under the particular circumstances of this case, the officers who seized Rouse for investigative purposes were entitled not only to frisk him but to briefly inspect the basket he was carrying for possible weapons. The officers were aware that Rouse had briefly entered and then exited an apartment where suspected armed robbers were holed up, and even when they appraoched with guns drawn, he ignored their repeated commands to go to the ground. Rouse's behavior created a heightened sense of danger that

would have justified an immediate inspection of the laundry basket contemporaneous with his seizure. But the fact remains that the officers did *not* conduct such an inspection as part of that initial seizure. Rather, Officer Rodgers kicked the basket aside and then secured it in the back of a patrol car without inspecting it. So, while the seizure of the basket was certainly justified, its later search by Cpl. Tracy Walden cannot be explained as a legitimate safety measure arising from the initial stop itself -- for by then, Rouse was in handcuffs, under the control of several officers, and separated by some distance from the basket.

Nor can the inspection of the basket be justified as incident to Rouse's arrest, for the testimony established that he was not under arrest at the time Cpl. Walden ran her hand under the clothing to determine why the basket was so heavy. Rather, as Det. Foster testified, it was the discovery of the guns in the basket that served as the basis for Rouse's arrest.[8] Until then, as the officers consistently testified at the

---

[8] The government argues that since the officers had probable cause to believe that Rouse had violated the Georgia law prohibition against obstructing or hindering a law enforcement officer in the lawful discharge of his duties, O.C.G.A. § 16-10-24, they were entitled to search Rouse and any container in his immediate possession incident to that arrest. But while they may have had probable cause to arrest Rouse for obstruction, they in fact never made such an arrest. Furthermore, in light of recent Supreme Court authority, because the basket was not searched until at least an hour after Rouse had been seized, handcuffed, and placed under the control of

hearing, Rouse was being "detained" for "investigative purposes," just as Det. Foster had instructed them to do. And as the Court has previously found, not only did the officers have sufficient reasonable suspicion to conduct such a *Terry* stop, the force they employed in making the stop was not so intrusive as to convert the investigatory seizure into a formal arrest or its functional equivalent. So, no incident-to-arrest theory is workable here.

The Court nevertheless finds that the search of the laundry basket was entirely reasonable and violated none of Rouse's Fourth Amendment rights. When Rouse's mother arrived at the scene, the police standoff with those inside Apartment C-7 had not yet concluded. Cpl. Walden (who, along with another officer, was standing alongside the apartment building guarding Andre Rouse at this time) intercepted Mrs. Rouse and her daughter as they approached the building. Walden determined that Mrs. Rouse was concerned about her sons as well as their puppy. Upon learning that Henry Rouse and the other suspects had exited the

---

other officers, it is highly questionable whether that search could be upheld as incident to his arrest, even had he been placed under arrest for obstruction. *See Arizona v. Gant*, 129 S. Ct. 1710 (2009) (search of an arrestee's vehicle while he was handcuffed and secured in the back of a patrol car could not be justified as a search incident to his arrest for driving on a suspended license, as there was no longer any possibility the arrestee could access the interior of his vehicle (and no reason to believe evidence of the offense of arrest might be found in that vehicle)).

apartment in compliance with police demands, Cpl. Walden released the puppy to Mrs. Rouse and, at the request of another officer, she was about to hand over the laundry basket as well. But when Walden lifted the basket from the patrol car, she noticed that it was exceedingly heavy and immediately suspected that it contained weapons. This suspicion was not an unreasonable one given all the events that had occurred that evening. Directing Rouse's mother and sister to step back, Walden placed the basket on the ground and then ran her hand underneath the clothes, where she felt the butt end of a handgun. This led to the discovery of the pillowcase filled with firearms, which prompted Rouse's arrest.

As Professor LaFave has recognized, even where the police can effectively protect themselves during a *Terry* stop by putting the detainee's handbag (or other item that might contain a weapon) out of his reach, it must be "recognized that there may exist circumstances in which the officer might 'reasonably suspect the possibility of harm if he returns such objects unexamined' and that in such circumstances the officer must be allowed to 'inspect the interior of the item before returning it.'" LAFAVE, § 9.6(e) at 673 (quoting Model Rules for Law

Enforcement, Stop and Frisk, Rule 605 (1974)). This case presents just such an exceptional circumstance. Clearly, the "'police should not be exposed to unnecessary danger in the performance of their duties.'" *Id.* at 678 (quoting *Michigan v. Long*, 463 U.S. 1032, 1064 (1983) (Brennan, J., dissenting)). Relinquishing control of a basket reasonably believed to contain firearms would have created precisely such a danger. True, the basket was about to be delivered to Rouse's mother and sister, not to Rouse himself. But an officer is not required to take the risk that a relative or friend of a person who has been taken into police custody poses no risk whatsoever if handed a pistol or other dangerous weapon. If, when Mrs. Rouse first appeared at the scene of the police standoff, an officer had reasonably believed her to be armed, he would have been entitled to frisk her and confiscate any weapon even without a suspicion of criminal wrongdoing on her part. *United States v. Bonds*, 829 F.2d 1072, 1073-74 (11th Cir. 1987) ("when an officer legitimately encounters an individual, whether he is investigating that individual or not, the officer may reasonably believe himself to be in danger and may wish to determine quickly whether that person is armed."). Simply turning over the suspicious laundry basket without first checking it for weapons was

simply not an option under these circumstances. Had Officer Walden felt a large bottle of detergent under the clothing rather than a handgun, all safety concerns would have ended and the basket, like the puppy, would have been released. But releasing the basket without first confirming that it posed no safety risk to the officers would have been poor police work indeed. Officer Walden's protective measure did not constitute an "unreasonable" search within the meaning of the Fourth Amendment.[9] Thus, Rouse has demonstrated no basis for the suppression of the firearms discovered in that basket.

## C.    The Cell Phone Search

Rouse's cell phone was found in his apartment during the execution of the search warrant. Rouse contends that the search warrant "did not give the police authority to seize or search [his] phone." (Doc. 37 at 2.) In this he is mistaken.

The warrant which authorized a search of Apartment C-7 permitted agents to seize "photos of subjects with weapons [and] digital

---

[9]    As this analysis furnishes sufficient grounds for upholding the search, the Court will not address the government's argument that the warrant for Apartment C-7 authorized a search of the laundry basket (as it contained items removed from the apartment while the warrant was being sought) or that the basket would have inevitably been searched as part of an inventory.

cameras."[10]  (Doc. 41-2 at 3.)  Rouse's cell phone, a burgundy Motorola "Razr," had a digital camera feature and thus fell within the warrant's scope.  *United States v. D'Andrea*, 497 F. Supp. 2d 117, 118 n.4 (D. Mass. 2007) ("There is no merit in defendants' argument that the seizure of the camera phone was unauthorized.  The warrant permitted the seizure of 'cameras'" and "[t]he modern cellular telephone fits easily into [that] categor[y].").

Moreover, a warrant need not specifically anticipate the type of container that may conceal the object of a search.  *United States v. Ross*, 456 U.S. 798, 820-21 (1982) ("[A] warrant that authorizes an officer to search a home for illegal weapons also provides the authority to open closets, chests, drawers, and containers in which the weapon may be found. . . . ."); *United States v. Gomez-Soto*, 723 F.2d 649, 655 (9th Cir. 1984) ("[T]he failure of the warrant to anticipate the precise container in which the material sought might be found is not fatal.").  A modern cell

---

[10]  The warrant specifically referenced a "black Nokia cell phone," as the armed robbery victim had informed the police that the robbers had taken such a phone from him.  (Doc. 37-2 (search warrant and affidavit).)  But the warrant also authorized the seizure of "digital cameras," and a camera phone such as Rouse's "Razr" certainly qualifies as a digital camera.  Moreover, the warrant permitted the seizure of "photos of subjects with weapons" and thus authorized the opening of any container where such photos might be found.

phone is a sophisticated device used for many purposes other than making simple phone calls. Most such phones, like Rouse's "Razr," are equipped with a digital camera feature designed to both make and store images. It was reasonable for the agents to conclude, therefore, that Rouse's phone could contain the images sought under the warrant, for "photos of subjects with weapons" were certainly the type of images capable of being stored on his phone. *Cf. United States v. Gambon*, 439 F.3d 796, 807 (8th Cir. 2006) (permitting seizure of cell phone under warrant that authorized seizure of "records of the use and purchase of controlled substances" since cell phones can contain such records); *United States v.* Thompson, 2004 WL 302037 at * 2 n.1 (S.D. Fla. Feb. 6, 2009) ("The court construes the term 'records' to include the information contained on cell phones . . . ."). Thus, the agents did not exceed the scope of the warrant when they seized the phone or accessed its camera feature to see what images it contained.[11] Consequently, the

---

[11] It matters not whether the agents searched the phone at the apartment or conducted that search at some later time. *See United States v. Hernandez*, 2007 WL 2915856 at *17 (S.D. Fla. Oct. 4, 2007) (unpublished) ("the seizure of computers, and subsequent analysis away from the search premises," has uniformly been held to be proper when the executing agents were authorized to search for records likely to be stored on a computer); *United States v. Sissler*, 1991 WL 239000 at *4 (W.D. Mich. Aug. 30, 1991).

seizure of Rouse's cell phone and its subsequent search were proper under the warrant.

## D.  Statements

Finally, Rouse seeks to suppress his custodial statements to Det. Foster and, later on, to Det. Hunt, contesting their voluntariness under *Jackson v. Denno*, 378 U.S. 368 (1984).[12]  (Doc. 14 at 4; doc. 17 at 1-2.) While Rouse also contends that Det. Hunt failed to advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court has credited Det. Hunt's testimony that he did administer the standard *Miranda* warnings prior to his interview.  The Court rejects Rouse's contrary testimony as simply not believable.  (Doc. 34.)

A statement is considered to be voluntarily made only if it is "the product of an essentially free and unconstrained choice by its maker." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).  Statements that result from "intimidation, coercion, or deception" by law enforcement officers are not voluntary and must be suppressed.  *Colorado v. Connelly*, 479 U.S. 157, 163 (1986).  Some form of government coercion is essential to a

---

[12] Rouse also seeks to suppress all of his statements as fruit of the "illegal" arrest.  (Doc. 14 at 5.)  Because his detention was reasonable, his later statements were not the tainted fruit of his initial seizure.

finding of involuntariness. *Id.* at 167. In determining voluntariness, the Court must assess "the totality of the circumstances -- both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Coercive conduct normally involves an exhaustively long interrogation, the use of physical force, or the making of a promise to induce a confession. *Connelly*, 479 U.S. at 163 n.1; *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992). Ultimately, the Court must determine whether a statement was made freely or whether the defendant's 'will has been overborne and his capacity for self-determination has been critically impaired.'" *Devier v. Zant*, 3 F.3d 1445, 1455-56 (11th Cir. 1993) (quoting *Culombe*, 367 U.S. at 602)).

The first interview, which was videotaped, occurred at around 3:00 a.m. in the morning after Rouse's arrest and after he was advised of his rights.[13] Rouse, who has completed his junior year in high school, was calm and cooperative for the hour-and-fifteen minute long interview and did not appear to be intoxicated. He did have one arm shackled to the

---

[13] Although Rouse initially claimed that he had not been advised of his *Miranda* rights, he later withdrew this argument after the government produced a waiver of rights form bearing his signature. (Doc. 34.)

chair and was tired after a full day of work, but he never asked for a break or indicated that he wished to terminate the interview. Det. Foster allowed him to smoke a cigarette and offered him a beverage at one point. At no time did the detectives threaten Rouse or use any force against him.

The second interview presents certain complicating factors. Conducted by Det. Hunt on December 12, 2008, it was not recorded because of an equipment malfunction. And though Hunt testified that he administered the standard *Miranda* warnings, he did not have Rouse sign an advice-of-rights form. Det. Hunt explained that he uses a "relaxed" interview style, which he finds leads to "more honest and open communication" with the person being questioned. Consistent with his more casual interview technique, Hunt did not handcuff Rouse during the interview and allowed him to sit next to him rather than across the table. He also gave Rouse a beverage and allowed him to smoke in the interview room.

Rouse nevertheless contends that his statements were not voluntary because he was mentally impaired as a result of having

consumed marijuana prior to the interview. The credible testimony at the suppression hearing does not support this contention.

It is undisputed that Rouse had been smoking marijuana when he was arrested at his apartment. But by the time of his interview at police headquarters an hour and a half later, Det. Hunt testified that Rouse "appeared to be levelheaded [and] didn't display any signs or characteristics of any person under the influence of drugs and/or alcohol." Further, during his cross-examination by government counsel, Rouse not only exhibited a marvelous memory of the facts leading up to the interview but conceded that he had only shared a single marijuana joint with two other people prior to the interview. After considering the conflict in the testimony, the Court finds that the government has demonstrated by a preponderance of the evidence that Rouse's statements were entirely voluntary and were not the product of any coercive conduct by the detectives. *Lego v. Twomey*, 404 U.S. 477, 489 (1972) (applying preponderance of the evidence test in voluntariness inquiries); *Jackson*, 378 U.S. at 391. Nor did the detectives take advantage of a person who was laboring under a significant mental impairment resulting from the consumption of marijuana. The Court

credits Det. Hunt's testimony that Rouse had his wits about him and freely consented to the interview.

## III. CONCLUSION

For all of the reasons explained above, Rouse's motion to suppress should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this  1st  day of June, 2009.

/s/ **G.R. SMITH**
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF GEORGIA**